**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:20-CV-1300 (JCH) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| JEFFREY ANDREWS, ET AL., | : | MARCH 27, 2024 |
| Defendants. | : | |

**RULING AND ORDER ON REMEDY (DOC. NO. 250) AND MOTION TO DISMISS
(DOC. NO. 253)**

**I.    INTRODUCTION**

Defendants, Jeffrey Andrews ("Mr. Andrews"), Lynn Cooke Andrews ("Mrs.

Andrews"), Ellery Andrews, Wesley Andrews, and Colton Andrews (the "Andrews

children") (collectively the "Andrewses") violated section 301 and 308 of the Clean

Water Act ("CWA") by, inter alia, discharging dredged and fill material into jurisdictional

wetlands located on their Property without obtaining a section 404 permit and refusing

to comply with information and access requests.  See Ruling on Motion for Summary

Judgment ("Summ. J. Ruling") (Doc. No. 243); Ruling on Motion to Strike Answers and

for Default Judgment on Liability Against Absent Defendants (Doc. No. 208).

Now before the court is the remedial stage of this matter.  See United States'

Brief Regarding Remedy ("Pl.'s Brief") (Doc. No. 250) at 9-13.  The United States seeks

an order and final judgment directing Mr. Andrews to restore the wetlands on the

Property located at 216 Northford Road, Wallingford, Connecticut and 69 Woods Hill

Road, North Branford, Connecticut (the "Property").  See id. at 9-13.  The government

further seeks a permanent prohibitory injunction preventing Mr. Andrews from dredging

or placing fill material into the wetlands, compliance assurance provisions, and civil penalties. See id. at 14-19.

Mr. Andrews did not submit a memorandum regarding the appropriate remedy, nor did he respond to the United States' position. However, he filed a Motion to Dismiss including the same arguments he raised at the evidentiary hearing regarding the remedy in this action. See Def.'s Motion to Dismiss ("Mot. to Dismiss") (Doc. No. 253). The government opposes this Motion. See Pl.'s Memorandum in Opposition to Def.'s Motion to Dismiss ("Pl.'s Opp'n Mem.") (Doc. No. 255).

## II.    BACKGROUND

The details regarding Mr. Andrews' decade long filling activities on wetlands located on the Property are set forth in the court's Ruling on the Motion for Summary Judgment. See Summ. J. Ruling at 4-10. The court provides a summary of those factual findings as necessary.

The Property in question consists of 72 acres of land located in Wallingford and North Branford in Connecticut and within the watershed of an Unnamed Tributary of the Farm River. [1]  See Summ. J. Ruling at 4. Prior to the filling activities on the Property, approximately 16.3 of the 72 acres constituted wetlands that abutted the Unnamed Tributary that flows to the Farm River. Id. at 5. The Property is "part of a wetland complex that provides a habitat for a range of aquatic organisms, exports detritus that supports the food chain, improves water quality by filtering runoff, and recharges shallow groundwater providing baseflows to the streams, among other functions." Id. at

---

[1] The evidence before the court is that Mr. Andrews is the person who undertook the work on the Property, both while he and Mrs. Andrews owned it and after they transferred it to their children on December 28, 2011. See Ex. 18, Andrews' Quit Claim Deed-Survivorship.

5-6 (quoting Pl.'s Mot. for Summ. J. Ex. D, Affidavit and Report of Andrew Earles

("Earles Report"), (Doc. No. 224-6) at 20. "[I]ncreased runoff . . . , reduced baseflow,

degradation of water quality, and loss of habitat" on the wetlands within the Property

"affect the physical, biological, and chemical characteristics of the Northeast Tributary,

the Southern Tributary, the Unnamed Tributary, and the Farm River." Id. at 6 (quoting

Earles Report at 20).

The Property exhibited signs of "clear-cutting, stumping, grubbing, filling, and

grading" that took place between 2010 and 2023. See Summ J. Ruling at 5-6. EPA on-

site investigations and expert findings demonstrated soil disturbances from stripping

and regrading—i.e., removing, spreading, and leveling—soil surface layers as well as

creation of drainage swales to direct excess runoff and seepage from excavation

activity. Id. at 7. Given the lack of sediment and erosion control structures, sediment

and possibly nutrients and pathogens made its way to the Unnamed Tributary. Id. at 7.

On April 27, 2010, the U.S. Army Corps of Engineers ("Corps") opened an

enforcement file for the Property after an inquiry from a wetland enforcement officer of

the Town of Wallingford, who also conveyed to the Corps the Andrews' noncompliance

with local cease and desist orders. Id. at 8. Nearly a year later, on April 15, 2011, the

Corps visited the Property for the first time and notified the family that they could not

conduct further work without the prior authorization of the Corps. Id. On November 12,

2017, after finding additional filling had occurred, the Corps referred the matter to the

EPA. Id. at 9.

> A Notice of Violation and Cease and Desist letter was issued by the Corps to Mr.
> and Mrs. Andrews on March 20, 2018. Nearly two months later, on May 16,
> 2018, the EPA sent notification letters to each member of the Andrews family
> reiterating the Corps' finding that additional filling of wetlands had occurred on

the property and advising the defendants to consult the Corps before conducting any additional work in the wetland areas.  Between May 2018 and April 2019, the EPA sought information—multiple times and by multiple means—from the defendants about the property and the family's actions on it.  These EPA missives, sent pursuant to section 308 of the CWA, also requested access to the Andrews' property to conduct field work and to assess the presence of the jurisdictional wetlands as well as the extent of potential CWA violations.  Despite warnings that failure to reply could result in civil penalties, the Andrews family did not respond to any of the EPA's many section 308 requests.

Id. (internal citations omitted).

In light of the Andrewses' unresponsiveness, the United States Attorney's Office for the District of Connecticut obtained an ex parte administrative warrant and order, which allowed the EPA and Corps to inspect the Property multiple times during a set inspection period of approximately a month from May to June 2019.  Id. at 9-10; see also Ex. 21, Administrative Warrant and Order.  The EPA found that the Property had been filled without a permit from at least 2009 until the end of the inspection period in June 2019, and consequently sent the Andrewses a Notice of CWA Violations.  See Summ J. Ruling at 10.

On September 2, 2020, the government filed its Complaint in the instant case, seeking injunctive relief and civil penalties under the CWA.  See id. at 10.  Shortly thereafter, the government successfully obtained a Preliminary Injunction over the defendants' then-counseled opposition, enjoining the defendants from placing additional dredge or fill material in jurisdictional wetland in prescribed areas.  See id. at 10-11; Ex. 24, Preliminary Injunction Order (Doc. No. 46).  On July 1, 2021, the government notified the court that the Preliminary Injunction had been violated because it had observed about 15 truckloads of new fill material in the protected area.  See Summ. J. Ruling at 12; Ex. 25, Notice Regarding New Fill Material on Litigation Site (Doc. No.

112); <u>see also</u> Ex. 22, Additional Filling Photographs, at 4-6; Ex. 23, 2010-2023

Cumulative Wetland Filling.

On May 31, 2022, the court granted default entry against the four absent

defendants, but denied the government's Motion for Default Judgment due to the risk of

inconsistent judgments weighing against the entry of partial final judgment under

Federal Rule of Civil Procedure 54(b). <u>See</u> Ruling on Motion to Strike Answers and for

Default Judgment on Liability Against Absent Defendants (Doc. No. 208) at 1-4.

On June 12, 2023, the court granted the United States' Motion for Summary

Judgment on liability, holding Mr. Andrews liable for violating section 301 and 308 of the

Clean Water Act ("CWA"). <u>See</u> Summ. J. Ruling. In its Ruling, the court specifically

held that the evidence indisputably established that the 16.3 acres of wetland on the

Property constituted "waters of the United States" as defined by the Supreme Court's

decision in <u>Sackett v. EPA</u>, 598 U.S. 651 (2023). <u>See</u> Summ. J. Ruling at 21-23. At

that time, however, the court declined to address remedies, reserving the issue for a

later phase of the proceedings. <u>See</u> Summ. J. Ruling at 22 n.9; <u>see also</u> Order (Doc.

No. 244).

On June 26, 2023, the court ordered the government and Mr. Andrews to file

initial briefing on the proper remedies to redress the CWA violations in this case and

scheduled an evidentiary hearing for September 26, 2023. <u>See</u> Order (Doc. No. 244).

On August 1, 2023, the government submitted its Brief containing its proposal

concerning the appropriate remedies. <u>See</u> United States' Brief Regarding Remedy

("Pl.'s Brief") (Doc. No. 250). Mr. Andrews did not submit a brief.

On September 26, 2023, the court held an evidentiary hearing concerning the remedies proposed by the government.  See Hearing Minutes ("Hr'g Mins.") (Doc. No. 251); Hearing Transcript ("Hr'g Tr.") (Doc. No. 254).  The government presented five expert witnesses, many of whom also served as witnesses for the government's Motion for Summary Judgment:

1.  Peter Stokely, an Environmental Scientist for the EPA and an expert in aerial photography interpretation and geographic information system analysis (GIS);

2.  Scott Schreiber, Vice President of Stream and Watershed Services at Wright Water Engineers, Inc. ("WWE") in Glenwood Springs, Colorado and a civil engineer with experience in hydrology, stream health, and stream restoration, and an expert in developing restoration plans;

3.  Raymond Putnam, a Physical Scientist and program coordinator for the Wetlands Enforcement Section of the EPA's Enforcement and Compliance Assurance Division in New England;

4.  Thomas Peragallo, a Senior Wetland Scientist at LEC Environmental Consultants, Inc. (LEC) an expert in restoring and replacing hydric soils; and

5.  Richard Kirby, a Senior Wetland Scientist at LEC Environmental Consultants, Inc. (LEC) and an expert in wetland plant community restoration.

At the hearing, the government further admitted into evidence twenty-eight exhibits, including, inter alia, the witnesses' declarations, maps and photographs of the Property, the government's proposed conceptual restoration plan, the EPA's Settlement Policy, and maps and photographs of additional filling.[2]

Mr. Andrews did not present any witnesses or evidence.  However, he sought to argue that the government's actions violated his due process rights under Kaiser Aetna v. United States, 444 U.S. 164 (1979), Lucas v. South Carolina Coastal Commission,

---

[2] Due to the number of proposed remedies, the court will discuss any findings of fact relevant to each remedy in the corresponding sections below.

505 U.S. 1003 (1992), and <u>Koontz v. St. Johns River Management</u>, 570 U.S. 595

(2013).  <u>See</u> Hr'g Tr. at 18:11-22:7, 75:3-77:11.  The same day, shortly following the

hearing, Mr. Andrews filed a Motion to Dismiss, raising the same argument.  <u>See</u> Mot. to

Dismiss (Doc. No. 253).  The government filed its opposition to Mr. Andrews' Motion on

October 17, 2023.  <u>See</u> Memorandum in Opposition to Motion to Dismiss ("Mem. in

Opp'n") (Doc. No. 255).

### III.   JUDGMENT AS TO THE ABSENT DEFENDANTS

On May 31, 2022, the court granted default entry against the four absent

defendants, but denied the government's Motion for Default Judgment due to the risk of

inconsistent judgments weighing against the entry of partial final judgment under

Federal Rule of Civil Procedure 54(b).  <u>See</u> Ruling on Motion to Strike Answers & for

Default Judgment on Liability Against Absent Defendants (Doc. No. 208) at 1-4.

In its briefing concerning the proper remedies in this action, the government has

only named Mr. Andrews in its proposed restorative injunction and civil penalties.  <u>See</u>

Pl's Brief at 1-18.  However, the government further asks the court to impose several

"compliance-assurance provisions" against the defendants.  <u>See id.</u> at 19.  These

compliance provisions involve: (1) granting the government the right to access the

Property for inspection, (2) prohibiting transfer of Property interests, and (3) requiring

defendants to record a deed restriction and the court's judgment in the land records of

Wallingford and North Branford.  <u>See id.</u> at 8-9, 19.  These provisions effectively amount

to injunctive relief against the Andrews children given their status as owners of the

Property.[3]  However, they may also affect any rights to the Property Mr. and Mrs. Andrews may have.[4]

It appears to the court that orders concerning access to the Property and the deed restriction are separate considerations from the proposed restorative injunctive relief and civil penalties.  Therefore, with respect to the restorative injunction and civil penalties assessed against Mr. Andrews, there is no reason for further delay in entering partial judgment under Federal Civil Rule 54(b) in this action against Mr. Andrews.  See Fed. R. Civ. P. 54(b).

With respect to the government's requests concerning compliance assurance provisions as to any defendants other than Mr. Andrews, the court will hold in abeyance

---

[3] Section 301 of the Clean Water Act provides that "the discharge of any pollutant by any person shall be unlawful."  See 33 U.S.C. § 1311(a).  The statute does not contain a causation requirement.  See West Virginia Highlands Conservancy, Inc. v. Huffman, 625 F.3d 159, 167 (4th Cir. 2010).  "On its face," it does not differentiate between a "'person' [who] was the root cause" and a person who was "merely the current superintendent of the discharge."  See id.  Further, the Act as a whole "consistently refers to the obligations of the 'owners and operators' of a point source, suggesting that successor land owners . . . are covered by the Act's provisions if they are responsible for a functional point source."  Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1143-44 (10th Cir. 2005) (citing, as examples, 33 U.S.C. §§ 1311(e), 1311(g)(2), 1342(a)(1), 1251(a)(3)).  Moreover, section 122.2 of title 40 of the Code of Federal Regulations defines "addition of any pollutant" as "surface runoff which is collected or channelled [sic] by man; discharges through pipes, sewers, or other conveyances owned by a . . . person which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works."  Sierra Club, 421 F.3d at 1144 (quoting 40 C.F.R. § 122.2)).  While a regulation is no "substitute for the CWA's plain language," section 122.2 "reinforces the view that ownership of a point source will trigger liability."  See id.  The same reasoning applies to section 308 of the CWA, which requires that "the owner or operator of any point source "provide the EPA Administrator with "information as he may reasonably require" to enforce the CWA.  See 33 U.S.C. § 1318(a)(4)(A) (emphasis added).  Thus, as owners of the Property, the Andrews children are jointly and severally liable and, pursuant to the CWA, may be subjected to remedies against them as ordered by the court.  See United States v. Sweeney, 2022 WL 17555626, at *16 (E.D. Cal. Dec. 9, 2022); United States v. Bedford, 2009 WL 1491224, at *1 (E.D. Va. May 22, 2009).

[4] Mrs. Andrews may be held liable for any disturbance to the wetlands prior to December 28, 2011, when she co-owned the Property with Mr. Andrews.  See Summ. J. Ruling at 4.  Most of the illegal activity took place after Mr. and Mrs. Andrews transferred the Property to the Andrews children.  The current evidentiary record does not demonstrate the precise extent of the disruption to the wetlands prior to transfer of title, or if and to what extent Mrs. Andrews was responsible for any of the disruption after transfer of title.

consideration of this issue pending submission of briefing from the government as to the liability of Mrs. Andrews and the Andrews children.  The government is ordered to file a Motion for Default Judgment against Mrs. Andrews and the Andrews children within 14 days of this Ruling and Order.  In its forthcoming Motion or Memorandum, the government shall provide its position on (1) what, if any, portion of the (a) restorative injunction, and (b) the compliance assurance provisions, any of these defendants should be responsible for; (2) what civil penalties should be assessed against each defaulted defendant; and (3) the necessity of a hearing on the remedies against the defaulted defendants.

## IV.    CLEAN WATER ACT REMEDIES

The purpose of the Clean Water Act ("CWA"), also known as the Federal Water Pollution Prevention and Control Act, is to "restore and maintain chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To fulfill this purpose, the CWA authorizes the respective agencies to commence civil suit for violations and the federal courts to "restrain such violation and require compliance."  See id. § 1319(b).

Pursuant to section 309 of the Clean Water Act, courts have broad discretion to fashion the appropriate remedy.  See 33 U.S.C. § 1319(b); Weinberger v. Romero-Barcelo, 456 U.S. 305, 320 (1982).  Such remedies may include temporary or permanent injunctions, civil penalties, compliance orders, requiring violators to seek a permit and, when criminally prosecution ensues, criminal penalties.  See Weinberger, 456 U.S. at 314, 318; 33 U.S.C. § 1319(b)-(c); see also Sackett v. EPA, 598 U.S. 651, 660 (2023).

Here, with respect to the section 301 violations, the government seeks temporary and permanent injunctive relief to restore the wetlands and prevent further disturbances. See Pl.'s Brief at 4; id. at 4 n.17 ("We do not seek separate injunctive relief with respect to the section 308 information request violations.").  The government further requests civil penalties for both the section 301 and 308 violations.  Id. at 4.

A.    Equitable Relief

The government requests equitable relief in the form of a (1) a mandatory restorative injunction requiring Mr. Andrews to develop and implement a restoration plan in accordance with the government's substantive guidance; (2) five provisions to ensure compliance with the restoration order and continued compliance with the CWA; and (3) a permanent prohibitory injunction.  See Pl.'s Brief at 8-9.

1.    Restorative Injunction

The government argues, see Pl.'s Brief at 9-10, and some courts hold that before considering the merits of the government's proposed plan, the court must: (1) "have jurisdiction over the portion of the property or activity to be directly affected by the restoration plan", and (2) "conduct a hearing in which the merits, demerits, and alternatives to the restoration plan are fully developed."  United States v. Smith, 1998 WL 325954, at *3 (4th Cir. June 18, 1998) (citing United States v. Weisman, 489 F. Supp. 1331, 1342-43 (M.D. Fl. 1980)).  In the instant case, these prerequisites have been met.  In granting summary judgment against Mr. Andrews, the court found that it has jurisdiction over 16.3 acres of wetlands on the Property.  See Summ. J. Ruling at 21-23.  The court held an evidentiary hearing devoted to expert testimony regarding different aspects of the government's proposed restorative injunction.  See generally Hr'g Mins. (Doc. No. 251); Hearing Transcript ("Hr'g Tr.") (Doc. No. 254).  Mr. Andrews

did not submit any briefing regarding remedies despite having ample time to do so, but he attended the hearing and had the opportunity to cross examine the government's expert witnesses.

In its Brief, the government specifically requests an order directing Mr. Andrews to develop an acceptable restoration plan ("Restoration Plan") with the assistance of a qualified wetlands expert or professional using the Conceptual Wetland and Tributary-Restoration Plan ("Conceptual Plan") prepared by the government as a starting point. See Pl.'s Brief at 8; see also Pl.'s Attachment A, Conceptual Wetland and Tributary-Restoration Plan Andrews Site ("Conceptual Plan") (Doc. No. 250-1). The Conceptual Plan divides the 13.3 acres of affected wetlands into four areas, each with its own specifications. Id. Generally speaking, the Conceptual Plan requires Mr. Andrews to:

> (1) remove imported fill from jurisdictional areas; (2) grade where necessary to re-establish wetland hydrology and create microtopographic relief to maximize water holding potential and biological diversity; (3) fill-in unauthorized ditches and the pond; (4) replace/remove a stream crossing structure and road; (5) seed and plant part of the violation area with wetland species to hold soils in place and jump-start natural re-vegetation; and (6) manage invasive species.

Pl.'s Brief at 12. The Conceptual Plan specifically requires that Mr. Andrews implement the Restoration Plan pertaining to active restoration within a year of the court's Order followed by a seven-year period of monitoring and adaptive management to ensure restoration of the area. See Conceptual Plan at 7[5]; Hr'g Tr. 62:16-64:22.

In evaluating the appropriateness and necessity of proposed remediation or restorative injunctions, courts have established three factors: "(1) whether the proposal would confer maximum environmental benefits, (2) whether it is achievable as a

---

[5] The court references the page number generated by CM/ECF because the Conceptual Plan is unpaginated.

practical matter, and (3) whether it bears an equitable relationship to the degree and kind of wrong it is intended to remedy." United States v. Deaton, 332 F.3d 698, 714 (4th Cir. 2003) (internal quotation marks omitted) (quoting United States v. Cumberland Farms of Conn., Inc., 826 F.2d 1151, 1164 (1st Cir. 1987)); United States v. Bailey, 571 F.3d 791, 805 (8th Cir. 2009); United States v. Cundiff, 555 F.3d 200, 216 (6th Cir. 2009); United States v. Brace, 2020 WL 956460, at *2 (W.D. Pa. Feb. 27, 2020); United States v. Donovan, 466 F. Supp. 2d 595, 598 (D. Del. 2006); United States v. Bradshaw, 541 F. Supp. 884, 885 (D. Md. 1982); United States v. Weisman, 489 F. Supp. 1331, 1343 (M.D. Fla. 1980); accord United States v. Sexton Cove Estates, 526 F.2d 1293, 1301 (5th Cir. 1976).  The court will review the government's Conceptual Plan using these three factors.

a.    Maximum Environmental Benefits

Courts have typically viewed the rehabilitation of wetlands to their pre-disturbance condition as conferring maximum environmental benefits.  See Cundiff, 555 F.3d at 216; Brace, 2020 WL 956460, at *2 (citing Smith, 1998 WL 325954, at *3); accord Donovan, 466 F. Supp. 2d at 598 ("Courts have recognized a mandatory duty to restore intentionally filled wetlands, unless equities weigh against restoration." (first citing Cumberland Farms, 826 F.2d at 1161-65; then citing United States v. Van Leuzen, 816 F. Supp. 1171, 1180 (S.D. Tex. 1993).  Because the goal of restoration is to reestablish wetlands' ecological functions, see Cumberland Farms, 826 F.2d at 1164, Sweeney, 2022 WL 17555626, at *6-8, courts have approved plans that are holistically designed to counteract even the unintended consequences resulting from a defendant's activities.  See id. at *8 (ordering defendants to, inter alia, replace invasive species with

12

native wetlands vegetation and rebuild the soil's structural integrity, rather than merely requiring the restoration of the property's physical form).

Here, the substantive guide encompassed in the Conceptual Plan was created by Scott Schreiber ("Mr. Schreiber"), Vice President of Stream and Watershed Services at Wright Water engineers Inc. ("WWE") and a civil engineer with experience in developing over 100 restoration plans, see Ex. 6, Declaration of Schott Schreiber ("Schreiber Decl.") at 1-2; Ex. 7, Curriculum Vitae of Scott Schreiber ("Schreiber CV"); Hr'g Tr. at 41:3-13, with the assistance of Thomas Peragallo ("Mr. Peragallo"), Richard Kirby ("Mr. Kirby"), Senior Wetland Scientists at LEC Environmental Consultants, Inc. ("LEC"), and experts in restoration of hydric soils and wetland plant communities, respectively.  See Ex. 27, Declaration of Thomas Peragallo ("Peragallo Decl.") at 1-2; Ex. 28, Declaration of Richard Kirby ("Kirby Decl.") at 1.

The government's asserted goal is to reestablish the 13.3 acres of forested, scrub-shrub, and emergent jurisdictional wetlands as well as restore the affected areas of the Unnamed Tributary to its pre-disturbance condition.  See Conceptual Plan at 1. Because the conditions vary across the wetlands, the Conceptual Plan divides the affected wetlands into four areas to effectively address their particular needs.  Id.  At a high level, the Conceptual Plan calls for reversing the work performed on the wetlands by removing dredged material, filling in drainage ditches with suitable topsoil, and removing culverts.  See, e.g., Conceptual Plan at 3 (Area 1); Hr'g Tr. at 48:3-49:1 (Area 2); see also Ex. 10, Area 1 Overview and Photo Log; Ex. 11, Area 2 Overview and Photo Log; Ex. 12, Area 3 Overview and Photo Log; Ex. 13, Area 4 Overview and Photo Log; Ex. 14, Fill, Topsoil, Seeding, and Planting Overview.  According to Mr. Schreiber,

removing fill, ditches, and culverts would reestablish the hydrologic conditions of the wetlands and its natural sheet flow, which were disrupted by Mr. Andrews' earthwork and installation of said structures. <u>See</u> Hr'g Tr. at 57:19-58:24.

The Conceptual Plan further provides for implementation of sediment and erosion controls as well as seeding areas of the wetland with a native wetland mix, planting vegetation, and removing pasture species. <u>See</u> Conceptual Plan at 3 (Area 1); Ex. 14, Fill, Topsoil, Seeding, and Planting Overview; Hr'g Tr. at 46:7-47:1. According to Mr. Schreiber, these measures are designed to facilitate the wetlands' return to their natural vegetative state, which has been disrupted by pasture species. <u>See, e.g.</u>, Hr'g Tr. at 61:24-62:7 (Mr. Schreiber noting that Area 4 involved a "considerable amount of pasture species"); <u>see id.</u> at 131:13-15 (Mr. Andrews stating that he bought the Property to farm).

Additionally, the government proposes a seven-year period of adaptive management. According to Mr. Schreiber, in order to ensure the restorative measures are effective, conducting periodic monitoring and functional assessments on the affected wetlands are necessary. <u>See id.</u> at 62:16-65:23. As Mr. Kirby clarified, this "adaptive management" stage of the Conceptual Plan may also require some reevaluation and further measures beyond those encompassed in the initial restoration period to meet changing conditions. <u>See id.</u> at 97:19-98:10. Mr. Schreiber stated in his Declaration that restoring the wetlands within the proposed period of one year and then implementing seven years of adaptive management will set the areas to be restored "on a path to naturally evolve over time into an ecosystem that was lost." <u>See</u> Ex. 6, Schreiber Decl., at 3.

The Conceptual Plan is generalized, but the court's review of it leads the court to conclude that the Conceptual Plan is specific enough to permit those engaged by Mr. Andrews to develop a specific Restoration Plan to accomplish the objective of reestablishing the jurisdictional wetlands as well as restore the affected areas of the Unnamed Tributary, all to their pre-disturbed condition.  See Sweeney, 2022 WL 17555626, at *8.  Based on the experts' technical knowledge and experience in the area of wetland restoration, the government has demonstrated that the proposed measures would reestablish the pre-disturbance ecological condition of the affected wetlands on the Property so as to restore their functions as a habitat and food source for natural animal and vegetative populations.  See Cumberland Farms, 826 F.2d at 1164-65.  Therefore, the Conceptual Plan satisfies the first factor.

b.    Achievable as a Practical Matter

The second element evaluates the proposed plan's feasibility from an environmental, engineering, and financial standpoint.  See United States v. Bailey, 571 F.3d 791, 805 (8th Cir. 2009) (citing United States v. Southern Inv. Co., 876 F.2d 606, 615 (9th Cir. 1989)); accord Sexton Cove, 526 F.2d at 1301.  Typically, wetland experts' opinions regarding the environmental and engineering aspects of the plan are determinative of whether a restoration plan is achievable as a practical matter.  See Cumberland Farms, 826 F.2d at 1165.  Moreover, courts have viewed conceptual plans, in particular, favorably because their inherent flexibility allow defendants to find avenues to reduce costs so long as the defendants remain faithful to the specified goals.  See Sweeney, 2022 WL 17555626, at *11; Brace, 2020 WL 956460, at *3 (citing United States v. Ciampitti, 615 F. Supp. 116, 123-24 (D.N.J. 1984)).

Critically, the Conceptual Plan is designed to be a substantive guide, providing Mr. Andrews and the wetlands expert or qualified professional they retain—as required by the government's proposal—flexibility to adapt given the conditions on the ground. Richard Putnam ("Mr. Putnam")—a Physical Scientist and program coordinator for the Wetlands Enforcement Section of the EPA—testified that evidence of hydric soils and reestablished vegetation on the jurisdictional wetlands on the Property demonstrate that restoration is achievable. See Hr'g Tr. at 108:18-109:10. Thus, absent evidence to the contrary, the government, through its wetlands experts, has demonstrated that restoration as set forth in the Conceptual Plan is achievable from a technical perspective.

With respect to financial feasibility, the anticipated cost estimate must be reasonable. See Smith, 1998 WL 325954, at *6. Mr. Schreiber, Mr. Peragallo, and Mr. Kirby provided cost estimates, taking into consideration local conditions. See Hr'g Tr. at 67:12-69:15 (total), 83:25-84:17 (topsoil); 95:20-96:18 (wetland plants and labor). Altogether, Mr. Schreiber approximates that the total cost would be $3,030,000. See Ex. 15, Conceptual Restoration Costs, at 2. The sum of each of the four area's estimated costs for implementation and engineering and construction observation, see Ex. 15, Conceptual Restoration Costs, at 3-6, would require Mr. Andrews to expend about $2,790,000 in the one-year proposed restoration period. Accordingly, about $240,000 are estimated for the adaptive management seven-year period. However, Mr. Schreiber also testified that the costs may vary, estimating a lower range of $1,500,000 and an upper range of $4,540,000, inclusive of the cost estimate for a seven-year

period of post construction monitoring and adaptive management.  See id. at 2; Hr'g Tr. at 68:11-69:6.

Mr. Andrews' flagrant violations could bar any equitable consideration of his ability to pay.  See, infra, at 18-20; see also Pl.'s Brief at 13 (citing Sweeney, 2022 WL 17555626, at *10; then citing Bailey, 571 F.3d at 805).  Further, given the Andrewses' failure to comply with CWA section 308 information and access requests as well as discovery requests and orders, there is virtually no evidence regarding any economic benefit Mr. Andrews might have received or expenditures related to converting the wetlands into pastures.  See Ex. 16, Putnam Decl. ¶ 17.  Therefore, the court cannot make a reasonable estimate of Mr. Andrews' financial status.  See, e.g., Smith, 2014 WL 3687223, at *1, 6 (ordering restoration with expected cost of $89,000 against a defendant who built five dams between 1998 and 2004 at a total cost of $180,000). United States v. Bailey, 516 F. Supp. 2d 998, 1015 (D. Minn. 2007) ("[The defendant] conceded at oral argument that removing the Road will probably not cost much more than building the Road did.").  While the proposed restoration period of one year may theoretically provide the maximum environmental benefits, it may not be feasible from a financial standpoint within the proposed timeframe.

There very well may be avenues for Mr. Andrews to bring the total cost of restoration closer to the lower range of $1,500,000 if, for example, the appropriate soil for filling excavations already exists on the Property, see Ex. 6, Schreiber Decl. at 9, or he owns the necessary machinery, see Sweeney, 2022 WL 17555626, at *11. However, the court cannot determine with the information before it whether the government's proposed deadline for completion of restoration satisfies the second

element at this time.  Therefore, given the inherent flexibility in the Conceptual Plan, the court conditions the proposed one-year period on a finding from the wetlands expert or other qualified professional—to be retained by Mr. Andrews as set forth in the Conceptual Plan—that Mr. Andrews is able to finance all required measures within that timeframe.  Mr. Andrews is ordered to submit a verified financial statement to the expert and the government within 15 days of the expert's designation.  Failure to obey the Order will be contempt of the court.  If the expert finds that, due to financial constraints, the restoration cannot be completed within a year, the expert is to propose a deadline to the government for submission to the court.

c.    Equitable Relationship to Harms

As to the last element, the government's Conceptual Plan must also "bear an equitable relationship to the degree and kind of wrong it is intended to remedy." Cumberland Farms, 826 F.2d at 1164.  The CWA's explicit goal is to "restore and maintain the chemical, physical, and biological integrity" of jurisdictional waters and wetlands.  See 33 U.S.C. § 1251(a); Deaton, 332 F.3d at 714.  A proposed restoration plan is equitable if its "main thrust is to reverse the [ecological] damage done", see Brace, 2020 WL 956460, at *3, even if it places a heavy burden on the defendants, see Smith, 2014 WL 3687223, at *5 (citing Cumberland Farms, 826 F.3d at 1165); Deaton, 332 F.3d at 714 (requiring the defendants to fill in ditches they created because merely allowing the defendants to remove the dirt they dug up "would let them benefit from their violation" and "likely compound the environmental damage").

Courts also place great emphasis on whether the defendant acted reasonably or in good faith under this element.  "As courts have repeatedly recognized, . . . inequitable conduct on the part of a defendant eviscerates any equitable arguments against

restoration." Donovan, 466 F. Supp. 2d at 598 (citing United States v. Pozsgai, 999 F.2d 719, 736 (3d Cir. 1993); then citing United States v. Robinson, 570 F. Supp. 1157, 1165 (M.D. Fla. 1983)); see Brace, 2020 WL 956460, at *3 (noting the repeated history of violating the CWA); United States v. Van Leuzen, 816 F. Supp. 1171, 1180 (S.D. Tex. 1993) (holding that the defendant's open and notorious violation of permit requirements meant that he had a mandatory duty to restore and remediate).

Here, Mr. Andrews has repeatedly, openly, and defiantly violated the CWA. Mr. Andrews' conduct bears a striking resemblance to that of the defendant in Donovan, who refused to cooperate with the EPA and Corps, violated cease and desist letters, and declared himself and property immune from federal law, all to frustrate the government's efforts to bring him into compliance—conduct which the Donovan court found barred any consideration of equitable arguments against the government's proposed restoration plan. Donovan, 466 F. Supp. 2d at 598. Furthermore, new fill material was placed on jurisdictional wetlands on the Property in violation of this court's Preliminary Injunction, see, e.g., Ex. 22, Additional Filling Photos, at 5, and even after this court found Mr. Andrews had violated the CWA, see id. at 6. See Cumberland Farms, 826 F.2d at 1165 (finding the remediation order bore an equitable relationship to the harm at issue, in part, due to defendant's "intentional, unlawful conversion activities continued even after the Corps actively tried to get [the defendant's] cooperation in complying with the law"). Thus, given Mr. Andrews' actions, the government's proposal satisfies the third and final factor.

In sum, the government's proposed restorative injunction, requiring a qualified expert or professional to create and implement a restoration plan using the Conceptual

Plan as a substantive guide, confers maximum environmental benefits, is achievable from an engineering and environmental standpoint, and bears an equitable relationship to the harms it is intended to remedy.  Although the government's proposed deadline of one year for completion of restoration is reasonable, it is imposed subject to a finding by the retained expert or professional that Mr. Andrews' financial resources permit such a schedule.  If the expert finds that, due to financial constraints, the restoration cannot be completed within a year, the expert is to propose a deadline to the government for consideration by the court.

### 2.    Permanent Prohibitory Injunction

The government also seeks a permanent prohibitory injunction preventing Mr. Andrews from dredging or placing filling material onto all 16.3 acres of jurisdictional wetlands.  See Pl.'s Brief at 14.

Under the CWA, courts have discretion in fashioning the appropriate remedy to restrain violations and require compliance.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 320 (1982); see 33 U.S.C. § 1319(b); accord Sweeney, 2022 WL17555626, at *14. The statute also explicitly contemplates permanent injunctive relief being an appropriate remedy in certain cases.  See 33 U.S.C. § 1319(b).  Thus, courts have found prohibitory injunctions appropriate to effectuate restoration where there is a history of persistent noncompliance.  See Bedford, 2009 WL 1491224, at *13; Sweeney, 2022 WL 17555626, at *14.

The court cannot permanently enjoin a defendant without a showing that he is likely to continue violating the CWA.  Sweeney, 2022 WL 17555626, at *14; Smith, 2014 WL 3687223, at *4 (citing United States v. Sea Bay Dev. Corp., 2007 WL 1378544, at *3 (E.D. Va. May 8, 2007); then citing United States v. Fabian, 522 F. Supp. 2d 1078,

1094-95 (N.D. Ind. Mar. 2, 2007)).  Indeed, generally, a plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 291 (2006)); Salinger v. Colting, 607 F.3d 68, 77 (2d Cir. 2010); accord Bedford, 2009 WL 1491224, at *13.

      From the outset of the government's involvement with the Property, additional fill has been continued to be placed on jurisdictional wetlands on the Property, even after the court preliminarily enjoined such activity, see, e.g., Ex. 22, Additional Filling Photos, thereby demonstrating a willingness on the part of Mr. Andrews to defy the court's orders and a likelihood of future violations.  However, this alone, is insufficient.  While a prohibitory injunction is seemingly appropriate because any continued dredging, placement of fill material, or other disturbance to the wetlands would counter the intended effects of the ordered restoration, the government has not argued or demonstrated why the other aspects of its proposed injunctive relief are inadequate.  Cf. Bedford, 2009 WL 1491224, at *14 (issuing a permanent prohibitory injunction in the absence of relief in the form of a restorative injunction or compensatory mitigation).  Furthermore, a vague prohibitory injunction such as the one proposed by the government here, see Pl.'s Brief at 14, merely enjoining what the law already prohibits,

is "superfluous and redundant". See United States v. Smith, 2014 WL 3687223, at *4 (S.D. Ala. July 24, 2014).

Thus, the need for a permanent, prohibitory injunction at this time has not been demonstrated. However, the government is not precluded from a prospective motion for a permanent, prohibitory injunction should the need arise.

### 3. Compliance-Assurance

To ensure compliance with the proposed restorative injunction, the government also requests that the order contain five provisions: (1) granting the government site access and inspection rights; (2) requiring the defendants to obtain the court's approval before transferring their property rights; (3) requiring that the defendants record the court's judgment in land records; (4) deed restriction to ensure protection of restored wetlands in perpetuity; and (5) retention of jurisdiction to resolve disputes and enforce the court's orders. See Pl.'s Brief at 19.

With respect to the request for an order requiring that the defendants obtain the court's approval before transferring property rights, none of the caselaw the court has reviewed has involved a compliance assurance provision that requires the court's approval before transferring property rights. However, the court in Sweeney entered an order asserting that the transfer of any property right, including any interest less than fee-simple ownership, does not deprive the parties of the obligation to comply with the court's order absent approval from the assigned Special Master. See 2022 WL 17555626, at *20. As addressed earlier, see, supra, 8 n.3, an individual may be held liable for violating the CWA even if they have no ownership rights in the property and similarly, the property owner may be held liable for permitting others to engage in activities that violate the CWA on their property. Cf. Sea Bay, 2007 WL 1378544, at *3

(noting that "property right in the land in question are irrelevant" to "potential prohibitive or mitigating injunctions). As such, the court finds the mandatory and prohibitive injunction as to the transfer of any property interest in Sweeney, see 2022 WL 17555626, at *20, sufficient to accomplish the goal of ensuring that Mr. Andrews remedy the disruption to the jurisdictional wetlands irrespective of ownership.

The government further requests that the defendants be ordered to record a deed restriction to ensure that the jurisdictional wetlands are protected in perpetuity, referencing United States v. Bedford, No:07-cv-491, 2009 WL 1491224, at *2 (E.D. Va. 2009) as an example. In Bedford, the court ordered a permanent deed restriction after determining that the government had satisfied the four requisite elements for the entry of a permanent injunction as set forth, supra, at 20-22. Id., at *13 (citing eBay, 547 U.S. at 391).

In support of this determination, the Bedford court found that: (1) environmental injuries are typically of a long nature and can seldomly be remedied by money damages; (2) the CWA does not provide for money damages; (3) the defendant has a history of noncompliance and refusal to cooperate; and (4) preservation of wetlands are in the interest of the public. See id., at *13. Many of these same considerations apply here. However, as discussed above, see, supra, at 20-22, the government has not sufficiently demonstrated that a permanent injunction is necessary.

Nonetheless, a deed restriction, even if temporary, is warranted. In Brace, the court granted the government's request for a permanent deed restriction, ordering the parties to confer upon the language to be included in the document. See Brace, 2020 WL 956460, at *3. Ultimately, the government sought, and the court approved, a deed

restriction with a duration of 20 years.  See United States v. Brace, No:1:17-cv-6-BR,

Order on Deed Restriction (Doc. No. 185); No:17-cv-6-BR, Pl.'s Proposed Deed

Restriction (Doc. No. 184-3).  A deed restriction of at least that duration is appropriate

given the proposed seven-year period of adaptive management and testimony

suggesting that the rehabilitation of the wetlands will involve a substantial recovery time.

Cf. Hr'g Tr. at 99:24-100:1 (". . . I do believe that seven years is going to be required to

make sure that this restoration is on the right trajectory so that in 100 years, it is

functioning the way it is intended to."); see also Pozsgai, 999 F.2d at 722 ("[H]ydric soil

takes 100 years or more to develop."); Bailey, 516 F. Supp. 2d at 1015 (". . . from an

environmental standpoint twenty-five years is but the blink of an eye.").  It is impossible

to predict whether the law will change such that future development of wetlands is no

longer regulated, but this does not prevent the court from imposing a meaningful

remedy designed now to rectify a serious and unlawful injury to protected wetlands.

Any restorative injunctive relief the court orders would be futile unless the defendants

are restricted from specified activities for a substantial period of time.  Thus, the court

will order: (1) the imposition of a deed restriction of 25 years; and (2) Mr. Andrews[6] to

submit to the government, within 45 days of this Order, proposed language to be

included in the deed restriction.  The government shall provide comments or approval

within 14 days of service.  If the defendants fail submit proposed language, the

---

[6] As Mr. and Mrs. Andrews have no current ownership rights in the Property, see Ex. 18, Andrews' Quit Claim Deed-Survivorship, the request for a deed restriction to be filed in the land records of Wallingford and North Branford is effectively injunctive relief against the Andrews children only. The court will await the government's brief, see, supra, at 9, before entering any relief regarding compliance assurance provisions against the Andrews children as the government requested, but the court expects it will do so.

government is ordered to submit its proposed language for the deed restriction no later than 21 days after the defendants' failure.

Furthermore, the court also concludes that the deed restriction is the appropriate vehicle to effectuate the other proposed compliance assurance provisions. Thus, the deed restriction must contain notice of the continuing obligations of Mr. Andrews[7] upon transfer of any Property rights as discussed, <u>supra,</u> 22-23, and language regarding inspection and access rights. The deed restriction, along with the court's instant Ruling regarding remedies and the Ruling granting the government's Motion for Summary Judgment (Doc. No. 243), are to be recorded in the Land Records within 30 days of approval of the deed restriction.

B.    <u>Civil Penalties</u>

In addition to injunctive relief, the government seeks civil penalties under the Clean Water Act. <u>See</u> Pl.'s Brief at 18. The government asserts that it is willing to hold a portion of those penalties in abeyance pending completion of the affected wetland's restoration. <u>Id.</u> Specifically, if substantial restoration of the wetlands is achieved, the EPA recommends a penalty of a minimum of $313,859; otherwise, it recommends a penalty of a minimum of $2 million against Mr. Andrews for violations that occurred on or after September 9, 2015.[8] <u>See</u> Ex. 16, Putnam Decl., ¶¶ 2, 12. The government further seeks $77,500 for Mr. Andrews' failure to respond to the section 308 information requests. <u>See</u> <u>id.</u> ¶ 2; Hr'g Tr. at 103:19-22.

---

[7] <u>See</u>, <u>supra</u>, at 24 n.6.

[8] The government only seeks penalties for CWA violations that occurred on or after September 9, 2015, given the five-year statute of limitations set forth in 28 U.S.C. § 2426.

The CWA expressly provides for penalties for defendants liable for violating sections 301 and 308.  See 33 U.S.C. § 1319(d).  "Such penalties are aimed at deterrence with respect to both the violator's future conduct (specific deterrence) and the general population regulated by the Act (general deterrence)."  Brace, 2020 WL 956460, at *4 (internal quotation marks omitted) (quoting United States v. Mun. Auth. of Union Twp., 929 F. Supp. 800, 806 (M.D. Pa. 1996), aff'd 150 F.3d 259 (3d Cir. 1998)).

Although the statute does not establish clear guidelines for determining the appropriate penalty, section 309 sets a statutory maximum of $25,000 per day for each violation, see 33 U.S.C. § 1319(d), which has been adjusted for inflation through the years and is currently $66,712 for violations after November 2, 2015.  See 40 C.F.R. § 19.4 (Eff. Dec. 27, 2023); see also Brace, 2020 WL 956460, at *4 n.1.  The statute further provides a list of factors to consider when determining the appropriate penalty, including (1) "the seriousness of the violation or violations," (2) "the economic benefit (if any) resulting from the violation," (3) "any history of such violations," (4) "any good-faith efforts to comply with the applicable requirements," (5) "the economic impact of the penalty on the violator, and" (6) "such matters as justice may require."  See 33 U.S.C. § 1319(d).

Based on these statutory considerations, some courts have employed a top-down approach, beginning by calculating the maximum and adjusting downward based on the factors set out in section 1319(d).  Smithfield Foods, 191 F.3d at 528; Donovan, 466 F. Supp. 2d at 599; Smith, 2014 WL 3687223, at *11; Bedford, 2009 WL 1491224, at *16.  Other courts have utilized the bottom-up approach, calculating the defendant's

economic benefit and then adjusting up or down based on the other 309(d) factors. Smithfield Foods, 191 F.3d at 528; Bedford, 2009 WL 1491224, at *16.

In order to determine which approach is more appropriate, first determining the statutory maximum applicable to the instant case is warranted.

### 1.    Statutory Maximum

Although section 309(b) of the CWA, the statutory provision specifying the maximum civil penalty, is not a "model of clarity," it has been interpreted as "appl[ying] separately to each violation of an express limitation." Borden Ranch P'ship v. U.S. Army Corps of Eng'rs, 261 F.3d 810, 817 (9th Cir. 2001) (internal quotation marks omitted) (quoting Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1137-38 (11th Cir. 1990)); accord United States v. Smithfield Foods, Inc., 191 F.3d 516, 527-28 (4th Cir. 1999), Smith, 2014 WL 3687223, at *10.

Here, Mr. Andrews would be liable for each fill, drainage creation, excavation, or other earthwork activity in violation of section 301 in addition to each time he failed to respond to the EPA's requests for information in violation of section 308 between September 9, 2015 and September 9, 2020.[9] See 33 U.S.C. § 1319(d); see also Smith, 2014 WL 3687223, at *11 n.19; Bedford, 2009 WL 1491224, at *16 nn.7-8.

Mr. Andrews failed to respond to section 308 requests eight times between May 2018 and April 2019. See Summ. J. Ruling at 26-27. The first and second section 308 requests were made on May 16, 2018. See Summ. J. Ruling at 26. Thus, the first two

---

[9] Notably most courts have not applied the statute of limitations in section 2426 of title 28 of the U.S. Code in calculating the maximum penalty authorized under the CWA. See, e.g., Smith, 2014 WL 3687223, at *11 ($561,662,500 for 16,323 days of violations, or about 44 years). However, given that the government only seeks penalties for the five-year period specified in section 2426, see Pl.'s Brief at 17, the court calculates the penalties accordingly.

violations would have occurred on June 14, 2018, assuming each request gave Mr.

Andrews 20 business days to respond, see Ex. 16, Putnam Decl., ¶ 43 ("The request

specified a response date of 20 business days from receipt.").  Both violations are

penalized per day until September 9, 2020, the date the Complaint was filed, see,

supra, at 27 n.9, resulting in a statutory maximum of $109,274,256. [10]   However, the

two requests were renewed in December 2018, March 2019, and April 2019. [11]   See

Summ. J. Ruling at 27.  Therefore, the statutory maximum for the eight violations

together would be roughly $330 million. [12]

    Regarding the section 301 violations, given the lack of information due to Mr.

Andrews' noncompliance with section 308 and refusal to cooperate with discovery

requests, the court can only estimate a conservative maximum statutory penalty.  As the

_____

[10] The statutory maximum adjusted for inflation is $37,500, for a violation that occurred between December 6, 2013 to November 2, 2015, and $66,712 for violations that occurred after November 2, 2015, and were assessed after December 27, 2023.  See 40 C.F.R. § 19.4; 88 Fed. Reg. 89309-01 (Eff. Dec. 27, 2023).

    An EPA request made on May 16, 2018, would require a response by June 13, 2018.  Therefore, the Andrewses were in violation of the CWA for failure to respond for 819 days from June 14, 2018 to September 9, 2020.  A $66,712 per day penalty for 819 days results in a total penalty of $54,637,128. Because two different requests were made, the penalty is doubled for a total of $109,274,256.

[11] For purposes of this estimate, the court calculated the first day of the violation as the 20th business day of each specified month.

    The failure to respond to the renewal of the two requests in December 2018, resulted in a violation period from December 28, 2018, until September 9, 2020 (i.e., 622 days).  A $66,712 per day penalty for 622 days for the two renewals results in a total fine of $82,989,728.

    The failure to respond to the renewal of the two requests in March 2019, resulted in a violation period from March 28, 2019, until September 9, 2020 (i.e., 532 days).  A $66,712 per day penalty for 532 days for the two renewals results in a total fine of $70,981,568.

    The failure to respond to the renewal of the two requests in April 2019, resulted in a violation period from April 26, 2019, until September 9, 2020 (i.e., 503 days).  A $66,712 per day penalty for 503 days for the two renewals results in a total fine of $67,112,272.

[12] The total penalty for the violations identified, see, supra, at 28 nn.10-11 is $330,357,824.

government's data shows, the wetlands on the Property were filled at various points from 2015 to 2020.  See, e.g., Ex. 23, 2010-2023 Cumulative Wetland Filling Map; Ex. 1, Declaration of Peter Stokely ("Stokely Decl."), ¶¶ 15-17.  Peter Stokely ("Mr. Stokely")—EPA Environmental Scientist and expert in aerial photography interpretation and GIS analysis—observed changes on the wetlands at various intervals between 2010 to February 2022.  See id. ¶ 14; see also Ex. 2, Aerial Photography Interpretation and GIS Analysis of the Andrewses' Site ("Aerial Photog."), at 10-13.  Within the applicable statute of limitations, he described the changes to the wetlands in 2016 generally and specific disturbances attributable to activity in September 2016, October 2016, December 2016, and October 2018, and noted a period of relative inactivity in 2017.  See Stokely Decl.  ¶¶14-17; Aerial Photog. at 11-12.  Even a conservative estimate of weekly filling or other earthwork that created the changes Mr. Stokely observed would result in an exorbitantly high maximum.  For example, the discharge of just one truckload of fill material on September 9, 2015, the earliest date in the statute of limitations period, results in a penalty of $120,342,876.[13]  Mr. Stokely specified that, after September 2015 and by March 2016, an additional 2.5 acres on the Property were filled.  See Stokely Decl. ¶ 15; Aerial Photog. at 11.  Thus, it is reasonable to assume the statutory maximum in the instant case is a number significantly greater than $120,342,876.  However, without the benefit of data concerning the dates of each disturbance on the wetlands, the court cannot calculate an exact number.

---

[13] One truckload of fill material that remains on the wetlands on the Property from September 9, 2015, to September 9, 2020, would result in a violation period of 1828 days.  The penalty for the first 55 days (i.e., between September 9, 2020 and November 2, 2015) is $37,500 per day.  See 40 C.F.R. § 19.4.  The penalty for the remaining portion of the violation period is $66,712 per day.  See id.  The total penalty is equal to ($37,500 x 55 days) + ($66,712 x 1,773 days) = $120,342,876.

As such, the bottom-up approach is more appropriate here, solely as a practical matter.  See Bedford, 2009 WL 1491224, at *16.

        2.       Bottom-Up Approach

           a.      Economic Benefit

The bottom-up approach begins with calculating the economic benefit the violators received by virtue of their noncompliance.  Bedford, 2009 WL 1491224, at *16.  Reasonable approximations of the economic benefit to the defendant are sufficient when the precise number is difficult to prove.  Id.

Raymond Putnam ("Mr. Putnam"), a Physical Scientist and program coordinator for the Wetlands Enforcement Section of the EPA's Enforcement and Compliance Assurance Division in New England, estimated Mr. Andrews' economic benefit to be quite substantial.  See Ex. 16, Putnam Decl. ¶¶ 17-19.  First, Mr. Putnam notes that, if Mr. Andrews had complied with section 404 permit requirements and successfully acquired a permit, he would have had to pay into an established In Lieu fee program to offset the lost wetland functions and services that would have occurred on their Property; thus, he factors this cost into the calculation.  See id. ¶ 18.  The In Lieu fee rate for the program for the Connecticut South Central Region is $7.45 per square foot. Id.  Because 5.5 acres of fill were discharged on the wetlands on the Property in the five years comprising the statute of limitations, the In Lieu fee here would have likely been $1.7 million.  Id.; see also Ex. 20, National Audobon Society, Inc. In Lieu Fee Program. Using the EPA's economic model, Mr. Putnam calculated the economic benefit from the delay in compliance to be $260,484—derived from the cost of obtaining a permit, the value gained from the delay in seeking a permit, and the delay in being held responsible for the In Lieu fee.  See id. ¶ 19.  The In Lieu fee amount, together with the estimated

economic benefit, is $1,960,484.  Critically, this total does not account for any profit Mr. Andrews might have received for any sale of timber and topsoil or accepting fill materials or any savings from cattle grazing on wetlands converted to pasture rather than purchased feed.  Id. ¶ 17.[14]

> b.    Adjustment Factors

The bottom-up approach then calls for increasing or decreasing the penalty amount from the economic benefit depending on the other statutory factors.  Bedford, 2009 WL 1491224, at *16.  Beyond the violator's economic benefit, the statute directs courts to consider the seriousness and history of violations, good-faith compliance efforts, the economic impact of the penalty on the violator, and other matters as justice may require.  See 33 U.S.C. § 1319(d).

> i.    Seriousness of Violations & Violations History

The seriousness of the violations refers to the environmental impact of the defendant's actions.  See Smith, 2014 WL 3687223, at *12 (citing Smithfield Foods, 972 F. Supp. at 344-46.  Critically, however,

> The United States is not required to establish that environmental harm resulted from the defendants' discharges or that the public health has been impacted due to discharges, in order for this Court to find the discharges "serious;" . . . Congress has stated that the objective of the Clean Water Act is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. The EPA itself recognizes that all pollutants create some harm or risk and that it is hard to quantify precisely that harm or risk.

United States v. Gulf Water Park Co., Inc., 14 F. Supp. 2d 854, 860 (S.D. Miss. 1998) (internal quotation marks and citations omitted).

---

[14] The court notes, in regard to future consideration of any judgment as to the Andrews children, that as current owners of title to the Property, they would enjoy an economic benefit.

Although there is no specific evidence before the court of the precise extent or scope of harm, there are sufficient relevant facts to evaluate the seriousness of the violations.  The Property is part of and is surrounded by land belonging to the South Central Water Authority public drinking water supply watershed.  See Summ. J. Ruling at 4-5.  According to Dr. Earles—a professional hydrologist and engineer—the wetlands on the Property are also:

> part of a wetland complex that provides a habitat for a range of aquatic organisms, exports detritus that supports the food chain, improves water quality by filtering runoff, and recharges shallow groundwater providing baseflows to the streams, among other functions.  The wetlands . . . affect the physical, biological, and chemical characteristics of the Northeast Tributary, the Southern Tributary, the Unnamed Tributary, and the Farm River due to increased runoff (rate, volume, and frequency), reduced baseflow, degradation of water quality and loss of habitat.   These effects are significant and more than speculative.

See Summ. J. Ruling at 5-6 (quoting Dr. Earles Report at 20).  Furthermore, the uncontroverted evidence demonstrates that wetlands disturbance has been ongoing since at least 2009, and Mr. Andrews' violations were willful and flagrant.  See Summ. J. Ruling at 8-10.  This clearly supports a determination that the violations were particularly serious.  See Gulf Water Park, 14 F. Supp. 2d at 859 (reasoning the discharge at issue was "serious solely by virtue of its duration", which was further supported by the defendants' willful and flagrant conduct).  Therefore, Mr. Andrews is not entitled to any mitigation under this factor, and an upward departure from the approximately $2 million of economic benefit would be justified.

ii.    History of Violations and Compliance Efforts

The absence of any past violation of environmental laws can help mitigate the penalty.  See Smith, 2014 WL 3687223, at *13 (citing Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, 2010 WL 1009797, at *4 (S.D. Ga. Mar. 18, 2010)).

However, "an ongoing history of a particular violation that spans a significant duration can justify upholding a higher penalty". Id. (citing Gulf Water Park, 14 F. Supp. 2d at 864).

The activities on the Property preceded the federal government's awareness of them. The Corps became aware of a potential violation on the Property after a Wallingford wetlands enforcement officer conveyed the family's noncompliance with local cease and desist orders. See Summ. J. Ruling at 8. Mr. Andrews indicated that he intended to continue his activities on the wetlands despite the Corps notifying him as early as April 2011, that he would need authorization from the Corps to conduct further work on the wetlands. Id. The Andrewses ignored the EPA's section 308 requests, impeding the agency's functions. See id. at 9.

Moreover, for the past thirteen years, additional filling has been observed on the Property even after the entry of a Preliminary Injunction on December 29, 2020, enjoining such activity. See, e.g., See Summ J. Ruling at 5-6; Ex. 23, 2010-2023 Cumulative Wetland Filling; see also Ex. 24, Preliminary Injunction Order (Doc. No. 46). Therefore, Mr. Andrews is not entitled to any mitigation under this factor, and an upward departure from the approximately $2 million of economic benefit, see, supra, at 30-31, would be justified.

iii.    Economic Impact on the Violator

The CWA also directs courts to consider the economic impact of a civil penalty on the violator. See 33 U.S.C. § 1319(d). However, "[w]here a violator cannot show that a penalty will have a ruinous effect, the economic impact factor under section 309(d) will not reduce the penalty. See Gulf Park Water, 14 F. Supp. 2d at 868 (citing Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd., 611 F. Supp. 1542, 1562 (E.D.

33

Va. 1985); then citing Pirg v. Powell Duffryn Terminals, Inc., 720 F. Supp. 1158, 1165 (D.N.J. 1989)).

Here, the court lacks any information relevant to determining the effect on Mr. Andrews. Given Mr. Andrews' willful failure to comply with discovery requests, he was precluded from introducing any evidence containing information that would have been responsive to such discovery requests, which includes information regarding his ability to pay. See generally Ruling on Motion for Sanctions (Doc. No. 229) at 16. Additionally, prior to the entry of default against Mrs. Andrews and the Andrews children for their failure to appear, they had not complied with Discovery Orders. See Ruling on Motion to Strike Answers & for Default Judgment on Liability Against Absent Defendants (Doc. No. 208) at 5 (noting the absent defendants' noncompliance); Entry of Default (Doc. No. 222). The court, thus, has no information on the financial situations of any of the Andrewses. Therefore, this factor neither mitigates nor weighs in favor of an increase.

### iv.    Other Matters as Justice May Require

In Smith, the court found it useful to consider the amount the defendant would have been subject to under EPA's settlement policy to assist in reaching a reasonable civil penalty. See Smith, 2014 WL 3687223, at *17-18. Here, the government substantially relied on its 2001 Revised EPA CWA Section 404 Settlement Penalty Policy ("EPA Settlement Policy") in reaching its recommendation that a minimum of $2 million be imposed against Mr. Andrews. See Ex. 16, Putnam Decl. ¶ 14. A review of the EPA settlement policy reveals factors appropriate for the court's consideration.

The EPA Settlement Policy provides that the minimum penalty it will accept in CWA settlements is equal to the economic benefit plus a "gravity" amount less litigation

considerations, ability to pay, and mitigation credits.  See Ex. 19, EPA Revised Clean Water Act Section 404 Settlement Policy ("EPA Settlement Policy") at 8 (Dec. 21, 2001); accord Smith, 2014 WL 3687223, at *17.  The preliminary gravity amount is determined by multiplying the sum of values assigned to environmental impact and compliance factors by a multiplier.  See Ex. 19, EPA Settlement Policy, at 10-14.  The multiplier is equal to "$500 for minor violations with low overall environmental and compliance significance, $1,500 for violations with moderate environmental compliance and compliance significance, and $3,000-$10,000 for major violations with a high degree of either environmental or compliance significance."  Id. at 10.  The preliminary gravity amount is then adjusted up based on recalcitrance, down based on the violator's efforts to achieve an efficient and timely resolution, or otherwise modified based on "other factors as justice may require".  See id. at 15-16.

Here, the government did not factor in ability to pay given the lack of information. See Ex. 16, Putnam Decl., ¶ 36.  Furthermore, although the government did not address litigation considerations or mitigation, a review of the EPA's Settlement Policy suggests that they are inapposite to the instant case.  See Ex. 19, EPA Settlement Policy at 17.  For example, the theoretical settlement amount would not be reduced in Mr. Andrews' case because there was no known problem with the reliability or admissibility of the government's evidence.  See id.

As discussed in more detail above, see, supra, at 30-31, the government modestly calculated the economic benefit as $1,960,484 based on the value Mr. Andrews gained by not applying for a section 404 permit.  Mr. Putnam assigned a recalcitrance factor of 20% in this case due to the failure to comply with several Corps,

state, and local orders and failure to respond or comply with several section 308 information and access requests, which compelled the EPA to seek an administrative warrant. See Ex. 16, Putnam Decl. ¶¶ 37-38. Mr. Putnam assigned a "degree of culpability" value of 12 out of 20 based on the fact that Mr. Andrews was well aware of the permitting required to conduct earthwork activities on the wetlands. See id. ¶¶ 39-41.

However, Mr. Putnam did not assign values to the environmental impact and compliance significance factors and thus, did not provide the court with the exact amount Mr. Andrews would have owed under the EPA Settlement Policy. Instead, Mr. Putnam merely suggested that, if substantial restoration is not achieved, the penalty should be no less than $2 million for the section 301 violations. See id. ¶ 21. However, the fact that the economic benefit estimate of $1,960,484 alone constitutes a significant majority of this penalty suggests that the government effectively "calculated" a moderate gravity amount of roughly $40,000.

Taking into consideration the long history of noncompliance and the seriousness of the violations, the bottom-up approach supports the $2 million penalty suggested by the government. Furthermore, as to the section 308 violations, the government substantially departed from the statutory maximum, recommending a penalty of $100/day, and only sought a penalty for the first information request. See Ex. 16, Putnam Decl. ¶ 44. The government's requests are moderate in light of the evidence before the court, which could justify substantially higher numbers.

The government's proposed penalties are reasonable in light of the statutory maximum and are in accordance with the penalties under the bottom-up approach.

Accordingly, the court agrees that a penalty of $2 million against Mr. Andrews for the section 301 violations and a penalty of $77,500 for the 308 violations is appropriate, subject to possible reduction upon completion of the Restoration Plan.

        3.    Abeyance

Because its priority is restoration of jurisdictional wetlands, the government is willing to reduce the section 301 penalty to $313,859, provided Mr. Andrews complies with the Order of restoration.  See Ex. 16, Putnam Decl. ¶ 2; Pl.'s Brief at 18 (". . . the United States is willing to place some amount of civil penalties in abeyance pending completion of the requested injunctive relief.").  Thus, the government effectively proposes that Mr. Andrews be ordered to pay $391,359 (i.e., $313,859 plus $77,560) and that $1,686,141, be held in abeyance while the Mr. Andrews complies with restoration.

Given the large anticipated expenses associated with restoration, the courts have used their discretion to suspend a portion of the penalties under the condition that the defendants implement the restoration plan, United States v. Cundiff, 2005 WL 8159530, at *6 (W.D. Ky. Jan. 12, 2005), aff'd, 555 F.3d 200 (6th Cir. 2009), or delayed ordering penalties until restoration is complete, see Sweeney, 2022 WL 17555626, at *15; Brace, 2020 WL 956460, at *4.  However, given the estimated average cost of $3,030,000 for the restoration of the 13.3 affected acres, see Ex. 15, Conceptual Restoration Costs, at 2, and the Andrewses' utter failure to provide information of their financial situation, the court has no idea whether Mr. Andrews would be able to fund the restoration plan and pay the penalties simultaneously.

In light of the government's prioritization of restorative injunctive relief, and the court's lack of financial information about Mr. Andrews, the court will delay ordering

penalties, <u>provided</u> the compliance of Mr. Andrews with the Order of restoration and restoration is completed.  <u>See</u> <u>Sweeney</u>, 2022 WL 17555626, at *15; <u>Brace</u>, 2020 WL 956460, at *4.  In the absence of compliance, the court currently views the government's modest position as a starting point.

## V.    MOTION TO DISMISS

Because the instant case is at the remedy stage, Mr. Andrews' Motion to Dismiss is procedurally barred as the court has already granted summary judgment against Mr. Andrews.  <u>See</u> Fed. R. Civ. P. 12(b).  However, in light of Mr. Andrews' status as a <u>pro se</u> litigant, the court is obligated to construe his filings liberally.  <u>See</u> <u>McLeod v. Jewish Guild for the Blind</u>, 864 F.3d 154, 156 (2d Cir. 2017).  Because Mr. Andrews' arguments do not pertain to remedies, the court will consider his Motion to Dismiss as a Motion to Reconsider the grant of the government's Motion for Summary Judgment.[15, 16]

"The standard for granting . . . a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, that might reasonably be expected to alter the conclusion reached by the court."  <u>See</u> <u>Shrader v. CSX Transp., Inc</u>., 70 F.3d 255, 257 (2d Cir. 1995).  "Admittedly, a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided."  <u>Id.</u>  As the government contends, Mr. Andrew raises the same arguments he has asserted

---

[15] Mr. Andrews asserts that his Motion to Dismiss is filed pursuant to <u>Saucier v. Katz</u>, 533 U.S. 194 (2001) and <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009).  The court does not address these cases as they concern the Fourth Amendment and qualified immunity and are thus inapposite to the instant case.

[16] The court also notes that Rule 7 of the Local Rules requires a Motion to Reconsider to be filed within 7 days of the Ruling sought to be reconsidered.  <u>See</u> D. Conn. L. Civ. R. 7(c).

in previous motions, which the court has already addressed.  See Pl.'s Opposition to Def.'s Motion to Dismiss ("Pl.'s Opp'n") (Doc. No. 255) at 2-4.  Thus, reconsideration is not appropriate in the instant case.

However, to the extent any of his arguments can be construed as an opposition to the remedies, the court will substantively address Mr. Andrews' arguments.  Mr. Andrews argues that, in Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992) and Koontz v. St. Johns River Management, 570 U.S. 595 (2013), the Supreme Court has determined that a person can build on wetlands located on private property.  See Def.'s Mot. to Dismiss at 1.  He further argues that, in Kaiser Aetna v. United States, 444 U.S. 164 (1979), the Supreme Court established that a property owner may develop wetlands.  See Def.'s Mot. to Dismiss at 1.

Mr. Andrews misreads and misinterprets all three Supreme Court cases.  Lucas and Koontz deal with the scope of the government's power over wetlands on private property.  In Lucas, the Supreme Court held that government action that deprives a property owner of all economically viable use of his land requires compensation.  See 505 U.S. at 1019, 1027.   In Koontz, the Supreme Court held that, in the land-use permit context, the government's request that a permit applicant expend money to offset the impact of developing wetlands on his property must satisfy the requirements of Nollan v. California Coastal Commission, 483 U.S. 825 (1987) and Dolan v. City of Tigard, 512 U.S. 374 (1994).  See Koontz, 570 U.S. at 612.  In other words, the fee or money demanded must have a "nexus" and "rough proportionality" to the costs of the proposed use of the land.  See Koontz, 570 U.S. at 605-06 (first citing Dolan, 512 at 391; then citing Nollan, 483 U.S. at 837).  Thus, Lucas and Koontz did not prohibit the

government's actions.  Rather, these decisions placed limits on the government's actions.

In <u>Kaiser Aetna v. United States</u>, 44 U.S. 164 (1979), the Supreme Court held that, when petitioners converted a pond on their property into a marina, it became "navigable waters" subject to Congress's authority under the Commerce Clause; however, that in and of itself did not allow the government to create a public right of access to the marina.  <u>See</u> 444 U.S. at 172.  The <u>Kaiser Aetna</u> Court further elaborated that, if Congress wanted to create a public right of access to the marina, it could, but whether such an act would amount to a taking is an entirely separate question.  <u>Id.</u> at 174-75.

All three cases are inapposite to the instant case.  None of the Andrewses ever applied for a permit; thus, <u>Koontz</u> is inapplicable.  <u>Kaiser Aetna</u> affirms the government's power to regulate the Property at issue here and emphasizes what this court has previously conveyed to Mr. Andrews—that the issue of whether the government's actions constitute a taking such that he should be justly compensated is a separate matter.  <u>See</u> Ruling on Motion to Dismiss (Doc. No. 200).  Because the Andrewses did not assert a takings claim or counterclaim, the <u>Lucas</u> inquiry, <u>i.e.</u>, whether the regulatory action deprives the defendants of all previously proscribed economically viable use, is not properly before this court.[17]  Moreover, the facts of

---

[17] To be clear, the Andrewses previously asserted a takings counterclaim against the government.  However, they withdrew this counterclaim when they filed their Second Amended Answer to the Complaint, which included a withdrawal of the Counterclaim Complaint.  <u>See</u> Second Amended Answer (Doc. No. 70) at 10; <u>see also</u> Second Amended Complaint Redline (Doc. No. 70-1) at 6-10.

Mr. Andrews has filed previous <u>pro se</u> Motions to Dismiss, in which he has raised takings arguments.  <u>See</u> Motion to Dismiss on Constitutional Grounds (Doc. No. 150); Motion to Dismiss as a

Lucas involved Lucas' intent to construct a dwelling on each of two waterfront lots, which he had purchased prior to enactment of a law by South Carolina that barred construction of any permanent dwelling on the lots.  The word "wetlands" does not appear in the opinion.

Contrary to Mr. Andrews' argument, none of the three cases on which he relies calls into question the government's authority over navigable waters under the Clean Water Act, see Deaton, 332 F.3d at 705-08, which include the wetlands on the Property that meet the Sackett standard.  As this court has already noted several times, the Andrewses must file a takings claim against the government in order for a court to answer the question of whether the government's authority over the jurisdictional wetlands on the Property goes so far as to constitute taking.  See, e.g., Summ. J. Ruling at 24; Ruling on Motions to Dismiss at 8 (Doc. No. 200).  Further, this court has advised Mr. Andrews that it is without jurisdiction to decide a takings claim with an amount in controversy that exceeds $10,000.  See Ruling on Motions to Dismiss at 8; see.  Thus, if the Andrewses wish to assert a takings claim against the government, seeking over $10,000, they must file such a claim with the Court of Federal Claims.[18]  See 28 U.S.C. § 1491 (The Tucker Act); Cundiff, 55 F.3d at 216.

---

Matter of Law (Doc. No. 233).  The court has held that such arguments are not grounds for dismissal of a CWA violation noted that, depending on the amount Mr. Andrews seeks, jurisdiction over a takings claim may only be proper in the Court of Federal Claims. See Ruling on Motions to Dismiss (Doc. No. 200) at 5-11; Summ. J. Ruling at 24-26.

[18] Notably, it is not clear that Mr. Andrews has standing to pursue a takings claim.  See Knaust v. City of Kingston, 193 F. Supp. 2d 536, 541 (N.D.N.Y. 2002) ("[T]o establish standing in the specific context of a taking claim, the plaintiff must demonstrate "the requisite interest in the property at issue and the deprivation thereof [by a governmental entity]." (internal citation omitted)).

The only evidence regarding interests in the Property is the Quit Claim Deed, which establishes the Andrews children as the owners.

Accordingly, Mr. Andrew's Motion to Dismiss is denied.

## VI.    CONCLUSION AND ORDER

For the reasons stated herein, the court denies Mr. Andrews' Motion to Dismiss (Doc. No. 253), construed as a Motion for Reconsideration.

Further, for the reasons stated herein, IT IS ORDERED THAT:

A.    <u>Further Briefing</u>

Within 14 days of this Order, the government is to file a Motion for Default Judgment against the defaulted defendants, Lynn Cooke Andrews, Ellery Andrews, Wesley Andrews, and Colton Andrews.  In its forthcoming Motion or Memorandum, the government shall provide its position on (1) what, if any, portion of the (a) restorative injunction, and (b) the compliance assurance provisions, any of these defendants should be responsible for; (2) what civil penalties should be assessed against each defaulted defendant; and (3) the necessity of a hearing on the remedies against the defaulted defendants.  The government is further ordered to promptly mail a copy of this Ruling to the defaulted defendants.

B.    <u>Special Master and Dispute Resolution</u>

A Special Master shall be appointed to oversee the restorative injunction against the defendants as set forth below.  If Mr. Andrews oppose the appointment of a Special Master, he is ordered to show cause why a Special Master should not be appointed no later than 21 days after the date of this Order.  The parties are directed, within 30 days of this Order, to submit, for the court's consideration: (1) suggested names of a possible Special Master and, practically speaking, how he or she will be compensated; and (2) a joint proposal prescribing the Special Master's role and duties.

C.    Restorative Injunction

1.  Mr. Andrews is to restore the disturbed wetlands on the Property located at 216 Northford Road, Wallingford, Connecticut and 69 Woods Hill Road, North Branford, Connecticut, consistent with the United States' Conceptual Wetland and Tributary-Restoration Plan ("Conceptual Plan") as a substantive guide.  See Pl.'s Attachment A, Conceptual Plan (Doc. No. 250-1).  Mr. Andrews is ordered to retain the services of a qualified wetlands expert or professional within 30 days of this Order.  If there are any questions regarding any element of the Conceptual Plan, Mr. Andrews is ordered to look to Mr. Schreiber's Declaration in the first instance.  See Pl.'s Ex. 6, Declaration of Scott Schreiber.  The objective of this mandatory injunction is to recover the loss of jurisdictional wetlands as well as their chemical, physical, and biological functions that resulted from the defendants' violative activities.

2.  Mr. Andrews is ordered to submit a verified financial statement to the expert and the government within 30 days of the expert's designation.  Failure to obey the Order will be contempt of the court.  If the expert finds that, due to financial constraints, the restoration cannot be completed within a year, the expert is to propose a deadline to the government for consideration by the court.

3.  Submission of Proposals

Within 75 days of this Order, Mr. Andrews shall, through a qualified wetlands expert, propose to the United States a detailed submission including a schedule and plan for implementing the United States' Conceptual Restoration Plan, taking into account the current state of the wetlands.  The United States shall, within 30 days of service of the proposal, provide Mr. Andrews with comments.  If the United States does not provide comments, Mr. Andrews shall file his submission with the Special Master, if

43

any, and the court, and comply with it.  If the United States provides comments, Mr. Andrews shall revise his submission consistent with those comments and file the revised submission with the Special Master, if any, and the court within 14 days. Thereafter, Mr. Andrews shall comply with the revised Restoration Plan.

Additionally, within 30 days of filing the controlling Restoration Plan, Mr. Andrews shall, through a qualified wetlands expert, submit to the United States a detailed submission including a schedule and plan for the implementation of the seven-year period of monitoring and adaptive management of the wetlands.  The submission shall include a schedule for filing status reports with the Special Master or, in the event no Special Master has been appointed, the court.  The submission shall also propose the required contents of the status reports.  The United States shall provide Mr. Andrews with comments within 30 days of service.  If the United States provides comments, Mr. Andrews shall revise the submission consistent with those comments and file the revised submission with the Special Master or, in the event no Special Master has been appointed, the court, and comply with the revised submission following the end of the restoration period.

 D. <u>Compliance-Assurance for Restorative Injunction & Deed Restriction</u>

To ensure compliance with the restorative injunction, the court further orders the following:

1.  Mr. Andrews must permit any representative of the United States the right to access and inspect, at all reasonable times and with reasonable advance notice of 5 days, the 16.3 acres of jurisdictional wetlands located within the properties at 216 Northford Road, Wallingford, Connecticut and 69 Woods Hill Road, North Branford, Connecticut.

2.  No transfer of ownership or control of the properties located at 216 Northford Road 69 Woods Hill Road, or any portion of such properties, including any interest less than fee-simple, such as an easement or lease, shall relieve Mr. Andrews of his obligation to comply with this Order absent the approval of the Special Master, and subject to appeal to the court.  As a condition to any transfer of any interest in the properties, Mr. Andrews shall reserve all rights necessary to comply with the Order.  If Mr. Andrews seeks relief from his obligations under this Order before a transfer of an interest in the properties, he may file a motion with the court.  Prior to a transfer of any interest, Mr. Andrews shall provide a true and complete copy of the Order and corresponding Ruling regarding remedies to the intended transferee, obtain the intended transferee's written acknowledgment thereof, provide written notice to the EPA at least sixty calendar days prior to the effectuation of the transfer, and file proof of compliance with the Special Master, if any, and this court.

3.  Within 45 days of this Order, Mr. Andrews is to provide the United States with a proposed deed restriction, which shall (1) cover the entire 16.3 acres of jurisdictional wetlands and be in effect for 25 years, (2) contain notice of the continuing obligations of Mr. Andrews upon transfer of any Property rights as discussed supra, at 45, and (3) language regarding inspection and access rights for representatives of the United States.  The government shall provide comments or approval within 14 days of service.  If the parties cannot agree upon acceptable language, they shall jointly present the matter to the Special Master, and then to the court.  If Mr. Andrews fails submit

proposed language, the government is ordered to submit its proposed language for the deed restriction no later than 21 days after the Andrews children's failure.[19]

E.    Duration

The restorative injunction provided for in this Order is not permanent.  If the Mr. Andrews has substantially complied with the performance criteria, as set forth in the Conceptual Plan and the forthcoming Restoration Plan, has been met, the injunction will terminate automatically following the period of adaptive management.  The deed restriction is to have a duration of 25 years.

However, if the parties are unable to agree that all performance criteria has been met, Mr. Andrews may file a motion before the Special Master in the first instance, and then before the court, articulating their position that the restorative injunction should terminate.

If Mr. Andrews fails to comply with the court's Order, the United States may, at any time, file a motion with the Special Master and, whether there is a Special Master or not, with the court, seeking modification of the injunctive relief.  On such a motion, the United States may renew their request for a permanent prohibitory injunction, or seek other appropriate relief, such as moving to hold Mr. Andrews in civil or criminal contempt.  The United States bears the burden of showing modification is necessary and supported by the evidence.  On a motion for permanent injunction in particular, the

---

[19]  The court will hold in abeyance the government's request that the deed restriction, the Ruling granting the government's Motion for Summary Judgment (Doc. No. 243), and the Ruling and Order regarding remedies be recorded in the Land Records of Wallingford, Connecticut and North Branford, Connecticut.  Given that the Andrews children are the owners of the Property, the court expects the government to include this request in their memorandum regarding proposed remedies as to the defaulted defendants.

United States bears the burden to show the requisite elements for permanent injunctive relief.

F.   Civil Penalties

The appropriate civil penalty assessed against Mr. Andrews will be determined after the Restoration Plan is completed or at such earlier time if the government moves based on Mr. Andrews' failure to undertake the remedial action ordered by this court.

G.   Retention of Jurisdiction

The court retains jurisdiction to resolve disputes and enforce the Order resolving this matter, and to enter civil penalties.

SO ORDERED.

Dated at New Haven, Connecticut this 27th day of March 2024.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge